UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO – CLEVELAND DIVISION

JORDAN GREENBERGER,
LINDSEY GREENBREGER, AND
J. GREENBERGER, PLLC

                 Plaintiffs,

-against-

BOBER, MARKEY, FEDOROVICH &
COMPANY,

                 Defendant.

Case No. 1:22-cv- **1:22 CV 2087**

**COMPLAINT**

**JUDGE CALABRESE**

Magistrate Judge Armstrong

FILED
NOV 18 2022
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

Plaintiffs Jordan Greenberger ("Jordan"), Lindsey Greenberger ("Lindsey"; with Jordan, "the Greenbergers"), and J. Greenberger, PLLC ("PLLC") (together, "Plaintiffs"), for their complaint against defendant Bober, Markey, Fedorovich & Company ("BMF" or "Defendant"), pleads the following:

**Preliminary Statement**

1. This is an action for professional malpractice against BMF, Plaintiffs' long-time accountants and advisors.

2. For approximately 15 years, BMF (and the accounting firm that, on information and belief, merged into BMF) prepared and filed one or all of the plaintiffs' tax-returns, and also acted as a trusted advisor whom the plaintiffs could email or call to obtain prompt advice and counsel concerning various financial issues, including without limitation strategies for reducing their tax liabilities. That relationship came to an end in or about the Spring of 2022.

3. On April 9, 2022, BMF surprised the Greenbergers by advising them that they had underpaid their estimated federal taxes for 2021, and that with the first quarter 2022 payment that was also coming due on April 18, that they had to pay $133,407 to federal and state taxing authorities in under 10 days.

1

4. The Greenbergers did not have the liquidity to timely pay those taxes, causing them to incur various late charges and interest with the relevant taxing authorities. The surprise also caused a tremendous amount of stress, and as a result of that surprise Plaintiffs decided that they would terminate their relationship with BMF and hire a new accountant.

5. In interviewing other accountants to potentially become Plaintiffs' new accountant, Jordan recalled BMF's ~$133,000 surprise and each of those other accountants expressed shock that BMF would allow that to happen both from a client-relationship stand-point as well as a tax counseling standpoint.

6. Plaintiffs learned that for 2021 taxes BMF had negligently relied upon a so-called "safe harbor" of basing estimated quarterly taxes upon a percentage of the tax-payer's prior year income rather than upon the tax-payer's actual financials for the given period, which was what BMF had usually done in the past for Plaintiffs and on information and belief is the proper course of conduct for advising clients like Plaintiffs, who include a small business that can have income fluctuations year-to-year.

7. The other accountants also promptly identified strategies that BMF did not advise – but should have advised – Plaintiffs to adopt in order to reduce their tax liabilities over the past few years.

8. One such strategy was making an "s-election" for the single-member professional limited liability company through which Jordan operates his solo-practitioner law practice (plaintiff PLLC). On information and belief, doing so would have saved the Greenbergers taxes over the past few years in an amount believed in good faith to be no less than the jurisdictional threshold of this Court.

9. In sum, BMF was negligent and caused Plaintiffs to suffer damages.

**Parties**

10. Jordan and Lindsey are adult individuals, have been married since 2010, and since in or about July 2018 have resided in New Jersey. Prior to moving to New Jersey, the Greenbergers resided in New York.

11. Jordan was born and raised in the Cleveland-area, and he still has various family members who live in the Cleveland-area, including several family members who on information and belief currently are individual and/or business clients of BMF.

12. PLLC is a New York professional limited liability company organized in 2016. Jordan is the sole-member and manager of PLLC.

13. On information and belief, BMF is an Ohio corporation with an office located at 600 Superior Avenue East, Suite 925, Cleveland, OH 44114-2619. On information and belief, BMF has another office in Ohio. However, Plaintiffs' relationship was with the downtown Cleveland office.

**Jurisdiction and Venue**

14. The basis of jurisdiction is 28 U.S.C. 1332(a)(1) (diversity jurisdiction) because, on information and belief, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

15. The basis of venue is 28 U.S.C. 1391(b) because, on information and belief, BMF resides in this judicial district and a substantial amount of BMF's omissions occurred while its personnel were in this judicial district.

16. This action should be assigned to the Cleveland courthouse because Plaintiffs' relationship was with BMF's downtown Cleveland office.

3

## Background

17. In or about 2007, Jordan graduated from law school and began working as an associate attorney at a Manhattan (New York) law firm. He needed an accountant to assist with preparing and filing his tax returns.

18. At that time, Jordan's parents resided in Cuyahoga county, his dad worked for a family business in Cleveland, and other members of his extended family resided in the Cleveland suburbs. On information and belief, Jordan's parents, the family business, and other family members used the downtown Cleveland based accounting firm Libman, Goldstine, Kopperman & Wolf (the "Libman Firm").

19. Even though he resided and worked in New York at the time, Jordan understood that the Libman Firm in Cleveland was qualified to help him with his taxes, and he naturally began using the same accounting firm as his parents and family.

20. For many years the Libman Firm did not charge Jordan for its services, on information and belief because the Libman Firm had a broader relationship with Jordan's family and Jordan's tax returns were relatively straightforward when he was a W-2 employee.

21. On information and belief, on or about November 1, 2014, the Libman Firm merged into BMF and the Libman Firm's office in downtown Cleveland became a BMF office.

22. In or about January 2016, Lindsey quit her job as a W2 employee for a large corporation in Manhattan and began working as an independent contractor based in Brooklyn, New York.

23. In or about late 2015, Jordan similarly decided that he was going to leave the law firm where he had been working and launch his own law practice.

4

24. On or about March 2, 2016, Jordan organized PLLC in New York, where he and Lindsey resided at the time.

25. On or about June 1, 2016, Jordan stopped working at the law firm where he had been employed since graduating law school in 2007, and he started practicing law as a solo-practitioner through PLLC.

26. On information and belief, as a single-member limited liability company, PLLC defaulted to being a disregarded entity for tax purposes, which, among other things, meant that PLLC did not file separate tax returns but instead was included as part of the Greenberger's returns (who filed as a married couple).

27. On further information and belief, because PLLC is treated as a disregarded entity for tax purposes, Plaintiffs were required to pay certain self-employment taxes.

28. At the time he launched his solo-practice, Jordan had no clients or book of business. Over time he obtained clients and grew his business.

29. The monthly, quarterly and annual revenues from the law practice were (and are) inconsistent and new revenue sources were (and are) unpredictable.

30. Jordan's primary contact at the Libman Firm, and then after the merger with BMF, was Mike Luxeder ("Mike").

31. Mike assisted Jordan (and then also Lindsey after they married) with preparing and filing their tax returns.

32. At various times Mike also solicited and provided the Greenbergers with tax strategy services.

33. At various times Mike, provided various other advice and counsel to the Greenbergers concerning their financial affairs.

5

34. On information and belief, in or about February 2017 Mike moved to Texas and left his employment with BMF.

35. BMF then assigned Plaintiffs to its employee Patricia Keener ("Pat").

36. Pat – like Mike before her – assisted Plaintiffs with the preparation and filing of their tax returns.

37. Pat – like Mike before her – was available to Plaintiffs to answer various questions throughout the year concerning financial matters.

38. Pat – like Mike before her – provided advice and counsel to Plaintiffs concerning various tax-related matters including without limitation strategies and methods to implement to limit Plaintiffs' annual tax liabilities.

39. On information and belief, the Libman Firm, and then BMF after the merger, prepared and/or filed one or more of Plaintiffs' tax returns (and any amendments thereto) for the tax years 2007-2021.

40. Notably, Plaintiffs' tax returns for various years had to be amended due to an error by Pat relating to the Greenbergers' household employee.

41. Despite originally asking the Greenbergers to pay a fee to file the amended returns, BMF agreed not to charge the Greenbergers a fee for the amendments.

42. However, the Greenbergers' relationship with the Libman Firm, and then after the merger their relationship with BMF, was not limited to the preparation and filing of tax returns.

43. BMF had duties to Plaintiffs beyond preparing and filing tax returns.

44. BMF had duties to Plaintiffs outside the scope of the "Tax Organizer" document.

45. The parties' relationship was not limited by the "Tax Organizer" document that BMF sent to one or more of the Plaintiffs in relation to gathering information for the preparation of Plaintiffs' annual tax returns.

46. On information and belief, the "Tax Organizer" document was never signed by Lindsey or PLLC, and only signed by Jordan in certain years.

47. Plaintiffs communicated to BMF that they wanted personalized advice and counsel on methods of reducing their tax liabilities.

48. Plaintiffs reasonably believed that BMF was qualified and capable of providing such advice and counsel.

49. At certain times, BMF did provide advice and counsel concerning methods of reducing Plaintiffs' tax liabilities (e.g., SEP contributions).

50. On one or more occasions, BMF charged Plaintiffs for researching and discussing tax planning and advice (e.g., BMF's 5/26/21 invoice; #10066916).

51. Plaintiffs also sought and received advice and counsel from BMF on various financial matters.

52. BMF referred Plaintiffs to a life insurance broker at or about the time Plaintiffs' first child was born.

53. BMF communicated with Plaintiffs' financial advisors.

54. BMF communicated with PLLC's bookkeeper / business advisor.

55. Other matters for which BMF provided one or more Plaintiffs advice and counsel include, without limitation (and in no particular order):

    a. Counseling on tax consequence of various SEP contribution levels (March-April 2017);

    b. Counseling on tax deductibility issues relating to cooperative apartments in New York City (February 2012);

    c. Providing advice and counsel concerning household employees (May 2015);

    d. Providing advice and counsel concerning the roll-over of retirement accounts (January 2014);

    e. Assisting with an IRS audit (January 2013);

    f. Providing advice and counsel concerning how to book IOLTA transactions on balance sheet (January 2017);

    g. Running tax projections based upon analysis of change in law and a potential home purchase (January 2018);

    h. Providing advice and counsel concerning payroll (July 2016);

    i. Providing advice and counsel concerning tax withholdings on Lindsey's W4 (June 2020); and

    j. Providing advice and counsel concerning deductions for business expenses (December 2016).

56. On information and belief, neither the Libmarn Firm nor BMF charged Plaintiffs for these various matters based upon the accounting firm's broader relationship with Jordan's family.

57. However, there are various emails between the parties reflecting the actual scope of their relationship. Further, on information and belief Pat kept notes of her communications with Plaintiffs.

58. In relation to Jordan and Lindsey ceasing to be W2 employees and starting their own businesses in 2016, BMF advised Plaintiffs that they would need to file estimated taxes with the IRS and applicable state taxing authorities on a quarterly basis.

59. The fact that BMF advised Plaintiffs that they would need to file quarterly estimated taxes confirms that BMF was not simply putting numbers on tax forms and filing papers with the IRS, and instead that BMF undertook the duty of giving Plaintiffs advice and counsel concerning their financial affairs.

60. Following that advice from BMF, commencing in 2016 Plaintiffs filed estimated taxes with the IRS and applicable state taxing authorities (New York and/or New Jersey) on a quarterly basis.

61. Prior to being terminated in 2022, BMF advised Plaintiffs how much money to pay on a quarterly basis, prepared the vouchers and relevant paperwork, and assisted with the filing and payment of such estimated taxes.

62. For many years, BMF reviewed PLLC's profit and loss statements to calculate the amount of quarterly taxes to be paid (and also Lindsey's P&L statements when she was not a W2 employee).

63. For example, on December 16, 2020 Pat emailed Jordan and Lindsey: "Good morning, Your 2020 4th quarter estimates are due January 15. I'll need Jordan's P & L and Lindsey's most recent pay stub. Jordan, please confirm that you have been working in New Jersey since March. Thanks Pat".

64. Later that day, Jordan emailed Pat his then-current 2020 P&L statement.

65. Jordan and Pat thereafter exchanged several emails concerning how to allocate the payment of taxes between New York and New Jersey.

9

66. Similarly, for calculating the prior 2020 quarterly tax payments and preparing the filing vouchers, Pat had also requested and received the then-current P&L statements.

67. For example, on June 17, 2020, Jordan emailed Pat a copy of PLLC's P&L statement from January 1 – June 15, 2020.

68. Similarly, in 2019 Jordan sent Pat PLLC's then-current P&L statements for purposes of calculating the estimated quarterly taxes.

69. For example, on April 1, 2019, Jordan sent Pat a P&L statement.

70. Similarly, in 2018 BMF requested that Jordan provide PLLC's P&L statements for purposes of calculating the estimated quarterly taxes dues.

71. For example, on September 5, 2018, Pat emailed Jordan and Lindsey: "Good morning, Your 2018 3rd quarter estimates are due 9/17. Jordan, please send me you [sic] law practice activity through 8/31…Also, let me know if there is anything unusual I should know about for 2018."

72. On September 11, 2018, Jordan emailed Pat PLLC's P&L statement for January-August 2018 for purposes of the third quarter estimated tax payment.

73. Similarly, in 2017 BMF requested that Jordan and Lindsey provide her and PLLC's P&L statements for purposes of calculating the estimated quarterly taxes dues.

74. For example, on May 31, 2017, Pat emailed Jordan and Lindsey: "Hi Jordan and Lindsey, I need an estimate of your 2017 income through 5/31/17 to compute your 2017 2nd quarter estimates which are due 6/15/17. I also need an estimate of your 2017 SEP contribution for this computation…"

75. On June 5, 2017, Jordan emailed to Pat a copy of Lindsey and PLLC's respective P&L statements.

76. For 2021, however, BMF did not base the quarterly payments upon PLLC's profit and loss (P&L) statements.

77. On information and belief, BMF negligently did not request and/or rely upon the P&L statements for 2021, but BMF should have done so because BMF knew (or should have known) that Plaintiffs' income fluctuated.

78. On information and belief, BMF should generally have known that small business owner's income regularly fluctuates, including that of a solo-practitioner (Jordan) and an independent contractor (Lindsey, when she was a 1099 independent contractor rather than a W2 employee).

79. For example, on December 11, 2019, Pat emailed about basing the 2019 Q4 estimated payment on Plaintiffs' 2018 tax "[u]nless your income will be materially lower than 2018…"

80. On December 17, 2019, Pat and Jordan had various emails about Plaintiffs' income being different between 2018 and 2019 (Lindsey's lower, Jordan's higher). On December 18, 2019, Jordan emailed Pat a copy of PLLC's then-current P&L statement and Lindsey's paystub.

81. Instead, for 2021 BMF relied upon a so-called "safe harbor" by which the taxpayer bases its quarterly payment on a percentage of the prior year's income.

82. Relying upon the so-called "safe harbor" for the 2021 quarterly tax payments, BMF advised Plaintiffs to make quarterly payments based upon a percentage of Plaintiffs' 2020 income.

83. PLLC's net income for 2021 was greater than PLLC's net income for 2020.

11

84. However, BMF did not advise Plaintiffs or prepare estimated quarterly payments based upon the actual 2021 income and instead based it upon the 2020 income.

85. Based on those calculations prepared by BMF, Plaintiffs paid quarterly estimated taxes to the IRS, New York, and New Jersey for 2021.

86. By early April 2022, Plaintiffs had already paid approximately $99,000 in federal taxes for 2021 and believed that they had paid all taxes due for 2021.

87. Knowing that the 2022 first quarter payment would be coming due in mid-April, Jordan contacted Pat about the estimated tax that was coming due for the first quarter of 2022.

88. On April 9, 2022, Pat emailed Jordan with the 2022 estimates that were due on April 18, 2022.

89. Pat advised Jordan that the estimated 2022 Q1 payments were $32,500 federal; $5,275 New York, and $1,150 New Jersey.

90. To Plaintiffs' surprise, however, Pat also notified Jordan that additional payments were due for 2021: $80,522 federal; $13,275 New York; and $685 New Jersey.

91. In other words, BMF advised Plaintiffs that they had less than 10 days to pay another $94,482 in taxes for 2021, plus $38,925 in taxes for 2022 Q1, for a total of $133,407.

92. This was a total shock to Plaintiffs, and surprising Plaintiffs with this information was an utterly unacceptable way for BMF to treat long-term clients.

93. Plaintiffs did not have the liquidity to pay $133,407 to taxing authorities within less than 10 days.

94. Although BMF sent an invoice to Plaintiffs for their services relating to the 2021 tax filings, Plaintiffs objected to the invoice and BMF agreed to write-it off.

95. BMF's writing off of the invoice was an implicit admission of their negligence.

96. Shortly thereafter, Jordan began interviewing other accountants to replace BMF as Plaintiffs' accountants.

97. Each of the accountants that Jordan spoke with expressed to Jordan that it was neither proper client-relationship nor proper professional practice for BMF to have given Plaintiffs the ~$130,000 surprise.

98. Each of the accountants that Jordan spoke with also identified strategies and methods that Plaintiffs could have implemented in prior years to reduce their tax liabilities, but that were never recommended by BMF despite Plaintiffs' numerous requests such guidance and BMF occasionally providing such advice and counsel.

99. One such strategy was making an "s-election" for PLLC.

100. On information and belief, making an "s-election" would materially reduce the self-employment taxes that would otherwise be due for a disregarded entity, like PLLC.

101. On information and belief, BMF was aware of the s-election strategy.

102. For example, BMF's website has an article entitled, "With an S-election, profits avoid the self-employment taxes that would be incurred by a partnership." https://bmf.cpa/2017/10/30/commonly-overlooked-items-for-maintaining-s-corporation-election/ [last visited November 10, 2022].

103. However, BMF did not advise Plaintiffs to make an "s-election" for PLLC.

104. Plaintiffs subsequently addressed with BMF the issue of the surprise as well as the strategies that the other accountants had identified to reduce tax liabilities.

105. Jordan spoke with Pat and two partners of BMF (Keith Libman and Theodore Wagner).

106. However, it became apparent to Plaintiffs that BMF was not as sophisticated an accounting firm as Plaintiffs had expected them to be, and further that BMF had very little interest addressing the colossal client-relations disaster that was the ~$130,000 surprise.

107. After approximately 15 years of working together, Plaintiffs terminated BMF's services in or about the Summer of 2022 and started working with a new accountant.

108. Plaintiffs thereafter attempted to amicably resolve their negligence claim against BMF absent litigation.

109. BMF engaged counsel to respond to Plaintiffs' demands, that counsel (fundamentally misunderstanding the law and the facts) rejected the claim, and accordingly Plaintiffs commenced this action.

110. Notably, BMF – an accounting firm that quite literally already has all of Plaintiffs' tax returns, P&Ls and the data backing-up the returns – refused to do its own calculation of how much money Plaintiffs would have saved if an s-election had been made in the past, and incredibly asked Plaintiffs to spend more money on the claim and provide them with a pre-action expert report from another accountant.

111. The fact that BMF refused to provide their own calculation was an implicit admission by BMF that their conduct had caused Plaintiffs to suffer damages. And BMF's request for another accountant's report confirmed what Plaintiffs unfortunately had recently learned: that despite how they market themselves, BMF were not that sophisticated or savvy of an accounting firm.

112. BMF's counsel also took the position that its duties and potential liability to Plaintiffs were limited by the "Tax Organizer."

14

113. BMF's counsel's position – that the parties' relationship was akin to that of a consumer who walks into a store-front tax preparer's office (e.g., H&R Block) for help filing taxes – was factually incorrect and frankly insulting to both Plaintiffs and BMF.

114. Over the long course of the parties' relationship, BMF was not simply plugging numbers into various lines of the tax forms.

115. BMF's advice and counsel to Plaintiffs on various financial matters was not subject to the terms or limitations within the "Tax Organizer".

116. The "Tax Organizer" document – limited to the preparation and filing of tax returns – does not preclude BMF from having duties to Plaintiffs relating to other services it was providing for years and years. BMF did have duties to Plaintiffs beyond the preparation and filing of tax returns.

117. Notably, there is no merger/integration clause in the "Tax Organizer" document.

## COUNT I – PROFESSIONAL MALPRACTICE (NEGLIGENCE)

118. Plaintiffs repeat and reallege paragraphs 1 through 117 herein.

119. BMF had a duty of reasonable care to Plaintiffs, their clients, to exercise skill and knowledge normally possessed by other accountants in good standing in similar communities.

120. BMF breached that duty, proximately causing Plaintiffs to suffer monetary damages.

121. Plaintiffs reasonably relied upon the information and advice provided by BMF, and reasonably believed that BMF was providing it with the appropriate advice and counsel tailored for Plaintiffs needs and circumstances.

122. BMF failed to provide reasonable and proper advice and counsel to Plaintiffs, thereby causing Plaintiffs to incur and pay tax liabilities greater than Plaintiffs should have faced if BMF had not breached its duties to Plaintiffs.

123. On information and belief, under the circumstances it was negligent for BMF to rely upon the "safe-harbor" for Plaintiffs' 2021 estimated quarterly tax payments without looking at PLLC's actual P&L statements. BMF should have known that a law practice's income can greatly vary from year to year, and that especially for an individual / sole-practitioner reference to the actual numbers in the P&Ls and not the safe-harbor should be made to avoid surprises and cash flow issues.

124. On information and belief, under the circumstances it was negligent for BMF not to advise Plaintiffs to make an s-election for PLLC.

125. On information and belief, under the circumstances it was negligent for BMF not to advise Plaintiffs to take advantage of PTET (pass-through entity tax) laws in New Jersey and/or New York.

126. On information and belief, BMF was negligent in its supervision of Pat.

127. BMF's negligence caused Plaintiffs to suffer damages, including without limitation: (a) penalties and interest on late tax payments relating to the ~$130,000 surprise; and (b) in relevant years paying more in self-employment tax than Plaintiffs would have been liable for if they had made an earlier s-election for PLLC.

128. BMF caused Plaintiffs to suffer damages in the amount of taxes that would not have been due and owing (and paid) if BMF had properly advised Plaintiffs to make an s-election for PLLC.

129. BMF's negligence proximately caused Plaintiffs to suffer damages in an amount to be determined.

130. On information and belief, Plaintiffs' actual damages proximately caused by BMF's various acts of negligence exceeds the $75,000 threshold for diversity jurisdiction.

WHEREFORE Plaintiffs request that a monetary judgment be entered in their favor, and against BMF, in an amount greater than the jurisdictional threshold of this court, plus interest from March 2, 2016 (the date PLLC was organized), costs and disbursements.

Dated: November 15, 2022

JORDAN GREENBERGER, ESQ.
*Pro se (for himself) and as counsel for Lindsey Greenberger and J. Greenberger, PLLC*

_____
Jordan Greenberger (pro hac vice application submitted with this complaint)
Mailing address: 41 Watchung Plaza, #334, Montclair, NJ 07042
jordan@jgreenbergerlaw.com
718-502-9555